CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

2/17/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| JOSHUA H., ) | |
| ) | Civil Action No: 4:25-cv-00002 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | By:    Hon. Thomas T. Cullen |
| ) |         United States District Judge |
| Defendant. ) | |

     Plaintiff Joshua H. ("Joshua") filed suit in this court seeking to overturn the Commissioner of the Social Security Administration's ("Commissioner's") final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. Joshua suffers primarily from degenerative disc disease, lumbar spinal stenosis, obesity, depression, anxiety, posttraumatic stress disorder ("PTSD"), and attention deficit hyperactivity disorder ("ADHD"). (R. 34.) On review of his application for DIB, an administrative law judge ("ALJ") concluded that, despite these conditions, Joshua could still perform light work with limitations. Joshua challenges that conclusion, calling for reversal on two primary grounds. Because the ALJ failed to fully explain how Joshua's mental limitations factored into his residual functioning capacity ("RFC") in a manner that enables this court to review her ultimate conclusion, the court will remand for further consideration of this issue.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his RFC, and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A. Procedural History

On April 21, 2021, Joshua filed an application for DIB, alleging disability beginning on March 20, 2022, but later amended his alleged onset date to January 19, 2023.[1] (*See* R. 31, 321.) On July 20, 2023, Joshua also filed an application for supplemental social security income. (*Id.*) His date last insured ("DLI")—the date on which he will last meet the Act's insurance

---

[1] The ALJ accepted the amendment and admitted the evidence into the record, so the court regards January 19, 2023, as the operative date of the onset of the disability. (R. 32.)

requirement, which is a prerequisite to receiving benefits—is June 30, 2026. (R. 32.) The DLI is the date by which he must establish disability to receive benefits.

Joshua alleged disability due to myriad conditions, including degenerative disc disease, lumbar spinal stenosis, obesity, depression, anxiety, PTSD, and ADHD. (R. 34.) Joshua's claim was initially denied on May 10, 2022, and again upon reconsideration on July 7, 2022. (R. 31.) Joshua requested a hearing and, along with his counsel, appeared before ALJ Holly Munday on October 5, 2023. (R. 31, 55–80.) ALJ Munday denied Joshua's claim on November 24, 2023. (R. 28–50.) In summary, the ALJ concluded that Joshua suffered severe medical impairments, but that he retained the RFC to perform light work, with some limitations. (R. 37–38.) Because a significant number of jobs exist in the national economy that an individual with Joshua's limitations could perform, the ALJ reasoned that Joshua was not disabled within the meaning of the Act. (R. 50.)

On January 17, 2024, Joshua requested that the Appeals Council review the unfavorable decision, but on December 6, 2024, the Appeals Council denied the request for review. (R. 1–4, 23, 322.) On January 22, 2025, Joshua filed suit, seeking this court's review. (Compl. [ECF No. 1].)

**B.  Legal Framework**

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th

Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step [two] concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is, by definition, "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry*

*v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**C. Medical Evidence**

Physical health

Because Joshua does not dispute the ALJ's determination with respect to his physical limitations, the court summarizes them briefly here. Between February and April 2018, Joshua saw two providers and complained of back pain that radiated down his legs. (R. 334, 378–79.) After the exams and imaging, Joshua was diagnosed with moderate degenerative disc disease, bulging discs, facet joint spondylosis throughout his mid to lower lumbar spine, acute lumbar radiculopathy, and lumbar radicular pain. (R. 334, 347–69.) Joshua received treatment for his lumbar issues from 2018 to 2021, including prescriptions and injections. (R. 347–427.) During a follow-up appointment on March 24, 2022, Joshua's imaging revealed an "unremarkable lumbar spine." (R. 470.)

Psychological health

On February 1, 2021, Joshua was diagnosed with mixed anxiety and depressive disorder. (R. 399.) Between 2018 and 2019, he treated his anxiety and depression with prescriptions and counseling, and practitioners noted he exhibited otherwise normal mental symptoms. (R. 348, 353, 357, 398, 406, 415.) By 2021, his mental health began worsening. (*See, e.g.*, R. 437.) He presented to Dr. Kimberly Wormuth at Piedmont Community Services on April 13, 2021 and was diagnosed with major depressive disorder, unspecified social phobia, and "uncomplicated" alcohol and cannabis abuse. (R. 437–39.) He also reported suicidal ideations and reported that he attempted suicide in February 2021, so he was eventually

prescribed additional anti-anxiety and anti-depression medications and outpatient mental-health therapy. (R. 439, 445–67.)

On March 20, 2022, Joshua saw clinical psychologist Dr. Susan Belyea, "alleg[ing] disability due to back injury, depression, anxiety, degenerative disc disease, learning disability, and traumatic childhood." (R. 471 (cleaned up).) Dr. Belyea noted that Joshua presented as "very depressed" with a "flat, blunted, and constricted range" of emotions. (R. 472.) At the appointment, Joshua self-reported other symptoms and described his own limitations, and Dr. Belyea opined that his symptoms were consistent with major depressive disorder, PTSD, generalized anxiety disorder, panic disorder, social anxiety disorder (social phobia), and moderate ADHD. (R. 471–77.) Dr. Belyea further observed that his "[a]ffect was consistent for symptoms of anxiety and depression," but that he showed no confusion, signs of hallucinations, antisocial or psychotic behavior, or suicidal ideations. (R. 472, 477.) According to Dr. Belyea's report, Joshua's "[a]ttention span and concentration were slightly below normal limits," but also that he was able to engage in basic math exercises and exhibited normal judgment, insight, and reasoning abilities. (R. 477.) Based on her observations, Dr. Belyea opined that

> [Joshua's] ability to perform simple and repetitive tasks is mildly impaired because he requires reminders and redirection. His ability to perform detailed and complex tasks is markedly too extremely impaired for tasks that require divided attention and due to unresolved symptoms of ADHD. He has not been able to sustain work full-time for more than two years, even with supportive mental health treatment. He has not been able to sustain full-time employment in the past. His mental health symptoms have affected his current work-related functioning in significant ways. At this point, these skills are markedly to extremely impaired for functioning that involves maintaining regular full-time attendance in the workplace, for performing

> work activities on a consistent basis, and for completing a normal workday or workweek without interruptions. He has been willing to accept directions from supervisors, and to appropriately interact with coworkers and with the public. As noted, his communication skills are affected by social anxiety. His ability to deal with the usual stresses encountered in competitive work is also impaired.

(R. 478.)

On April 19, 2022, Marcia Love, PA-C, drafted a medical consultant report for the Virginia Department of Rehabilitative Services, primarily reviewing Joshua's physical symptoms. (R. 481–87.) PA Love diagnosed Joshua with lower back pain, anxiety, depression, a learning disability, and a traumatic childhood. (*Id.*) She further opined that Joshua could frequently lift and carry up to 20 pounds, reach, handle, feel, and grasp; that he could occasionally stoop, kneel, and squat; and that he should never bend. (R. 486–87.) Finally, PA Love opined that Joshua could sit for about six hours in a normal eight-hour workday, but could only stand or walk for two hours. (R. 486.) PA Love also reported that, aside from displaying a depressed mood and affect, Joshua had a normal mental status with "linear and logical" thought processes. (*Id.*)

On September 6, 2022, Family Nurse Practitioner ("FNP") Melinda Winikur conducted an evaluation of Joshua's physical and mental symptoms. (R. 489.) In addition to physical limitations caused by his back pain, FNP Winikur noted a number of Joshua's mental-health symptoms, including "blunt, flat, or inappropriate affect," feelings of worthlessness, difficulty with focus and concentration, memory loss, anxiety, flight of ideas, and impairment of impulse control. (R. 490.) She further opined that Joshua displayed mild impairment in carrying out short/simple instructions, moderate impairment maintaining concentration and

- 8 -

performing at a consistent pace, and marked impairment in getting along with the general public, coworkers, supervisors, responding to changes in routine, and dealing with normal work stress. (R. 490.) She further opined that Joshua would be absent from work at least four days per month due to his physical and mental impairments. (R. 489–90.)

In early to mid-2023, Joshua saw multiple providers for treatment for his back pain and mental health. (R. 540–617.) He also attended counseling sessions at Piedmont Community Services. (R. 618–649.) During the relevant period, counselors reported his minimal to mild impairment in certain daily activities and normal thought process, content, and concentration. (R. 639–41, 648.)

On June 1, 2023, Joshua saw multiple providers and complained of feelings of wanting to end his life.[2] (R. 493, 532–39.) Joshua was classified as a high suicide risk and transported to the SOVAH Health-Martinsville emergency room for displaying "erratic behavior and reportedly making suicidal statements." (R. 491, 493.) After evaluation, he was admitted to the inpatient unit. (*Id.*) Joshua requested to be discharged and "adamantly denied suicidal [or] homicidal ideations" and did not display "elicit delusions or bizarre behaviors." (*Id.*) Staff determined that Joshua could not be detained or involuntarily committed, and he left the emergency department against medical advice. (*Id.*)

Joshua presented at G.A.P.S. Healthcare on June 5, 2023, for a follow-up visit after his emergency-room visit. (R. 525–65.) Joshua denied current suicidal or homicidal thoughts. (R. 526.) FNP Tracie Hampton evaluated him for various mood disorders and confirmed a

---

[2] Joshua attributed this incident to side-effects from his Spravato prescription. (R. 648.) He was first prescribed Spravato (esketamine) on January 19, 2023, for his depression. (R. 565.)

diagnosis of major depressive disorder, generalized anxiety disorder, and PTSD. (R. 530.) FNP Hampton opined that Joshua did not show a "clinically significant problem with attention, concentration, organization, or disruptive behavior symptoms" based on his: alertness; a linear, coherent, and logical thought process; normal thought content; intact judgment, memory, and insight; and ability to "do deductive reasoning or abstraction." (R. 527–30.)[3]

**D. Opinion Evidence**

Dr. Jo McClain, a state agency psychological consultant ("SAPC"), performed an initial review of Joshua's SSA disability application on April 29, 2022. (R. 81–93.) Upon review of the medical evidence, including Dr. Belyea's report, Dr. McClain determined that Joshua's physical and psychological symptoms could reasonably be expected to produce Joshua's pain and symptoms, but found that his statements regarding the severity and symptoms of his impairments were only partially consistent with the medical evidence. (R. 87.) She opined that, despite some exertional limitations, Joshua could occasionally lift 20 pounds, frequently lift ten pounds, and stand, walk, or sit for six hours in an eight-hour workday. (R. 89.) She opined that Joshua has some mental limitations due to depression, PTSD, anxiety, and ADHD, including moderate limitations in understanding, remembering and applying information; interacting with others; and concentrating, persisting, and maintaining pace. (R. 86.) She also opined that Joshua has a mild limitation in adapting or managing himself. (*Id.*) While Dr. McClain determined that Joshua would have difficulty following complex instructions and maintaining concentration, she also determined that he "would be able to interact . . .

---

[3] From January 19 to May 2, 2023, Joshua presented to FNP Hampton with symptoms of anxiety and depression. (R. 540–65.) The reports of these visits were substantially similar to her June 5 reports. (*Id.*)

- 10 -

occasionally and work independently" and perform "simple, repetitive tasks for two-hour time blocks to complete a full-time workweek with no more than 10 [percent] of time off task." (R. 91 (cleaned up).)

A second SAPC, Dr. Howard Leizer, reconsidered Joshua's disability application on July 4, 2022. (R. 95–103.) He agreed with Dr. McClain's conclusion that Joshua would have mild limitations in adapting and managing himself, as well as moderate limitations in understanding, remembering and applying information; interacting with others; and concentrating, persisting, and maintaining pace. (R. 99.) He also similarly opined that Joshua would have difficulty interacting with the public and performing complex tasks, but that he could interact with coworkers occasionally and perform simple, repetitive tasks independently "for two-hour blocks to complete a full-time workweek with no more than 10 [percent] of time off task." (R. 104 (cleaned up).)

**E. Testimonial Evidence**

On October 10, 2021, Joshua's mother completed a third-party function report in support of his claim. (*See* R. 274–81.) In that report, she stated that Joshua assists her with daily chores, including taking her to appointments and helping with housework. (R. 275.) She attested that Joshua does not have difficulty with handling personal care tasks, such as personal hygiene, meal preparation, or taking medications. (R. 276.) She also stated that Joshua does not have difficulty with leaving the house to go shopping and that he can perform simple, quick tasks, like meal preparation and laundry, and can manage his own finances. (R. 276–79.) Joshua's mother attested that he has depression and difficulty with physical tasks due to his degenerative disc disease, and that he cannot drive for long periods of time, lift more than 20

pounds, or stay comfortable for an extended period of time sitting or standing. (R. 275–77.) Finally, she stated that he has a fair ability to handle stress, is short-tempered, and has suicidal thoughts. (R. 280.)

On October 5, 2023, Joshua appeared in front of ALJ Munday via videoconference. (R. 57–80.) Joshua testified that he deals with "some pretty extreme mental health issues," including daily anxiety, PTSD, "treatment-resistant depression," difficulty sleeping, self-loathing, and suicidal thoughts. (R. 65–66.) He also testified to discomfort in social situations, such as going to the grocery store, and being hyperaware of "everything and everyone around [him]." (R. 66.) Joshua expressed a desire to avoid medications as much as possible and described adverse side-effects, including both anxiety and drowsiness, based on the prescription. (R. 67–69.) He also testified that he assists his disabled mother with daily chores and tries to exercise for 15–20 minutes a day, but that these activities—as well as sitting and laying—become uncomfortable after extended periods of time. (R. 70.) Joshua also testified that he worked previously at a Pizza Hut and a department store but stopped work in January 2022. (R. 72–73.)

A vocational expert ("VE") also testified at the October 5 hearing. (R. 73–78.) The VE testified that Joshua's current limitations prevented him from engaging in any of his past work activities, including medium to light unskilled work, but that he could perform other light, unskilled jobs (*e.g.*, clerical checker (DOT code 222.687-010), sorter (DOT code 222.687-014), laundry folder (DOT code 369.687-018)). (R. 76.) When the ALJ asked if an individual could perform these jobs if he required an unscheduled break, would be off task 20 percent of the time, or would take two unplanned absences each month, the VE stated that these limitations

would eliminate all work. (R. 77–78.) The VE testified that his answer was based on his "knowledge and experience as a vocational rehabilitation counselor," because the reference guides he used during testimony do not specifically address the vocational impact of being off-task, absenteeism, or social limitations. (R. 77–78.)

### F. The ALJ's Opinion

The ALJ concluded that Joshua suffered from the following severe impairments: degenerative disc disease, lumbar spinal stenosis, obesity, depression, anxiety, PTSD, and ADHD. (R. 34.) The medical evidence also revealed that Joshua had hypertension and abused alcohol and marijuana, which were non-severe.[4] (*Id.*) She found, however, that Joshua did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.*) After "careful consideration of the entire record," the ALJ determined that Joshua had the RFC to perform light work, *see* 20 C.F.R. §§ 404.1567(b) and 416.967(b), with

> [no] frequent kneeling and crouching; occasional stooping, crawling, and climbing ramps/stairs; no climbing ladders/ropes/scaffolds; frequent exposure to vibrations; frequent exposure to hazardous conditions, including unprotected heights and moving machinery; simple, routine tasks; occasional interaction with the public and coworkers; and occasional workplace changes.

(R. 37.) As a result, the ALJ determined that Joshua could perform work as a clerical checker, sorter, or laundry folder. (R. 49.) The ALJ therefore concluded that Joshua was not disabled,

---

[4] According to the ALJ, Joshua's hypertension was treated such that he had normal blood pressure and cardiovascular signs before the hearing. (R. 34.) She also determined that he did not require treatment for his substance abuse. (*Id.*) Therefore, ALJ Munday found that these symptoms were "not severe[] when assessing [Joshua's] residual functional capacity." (*Id.*)

as defined in the Act, from the alleged onset date—January 19, 2023—through the date of the decision. (R. 50.)

## III.    ANALYSIS

Joshua challenges the ALJ's opinion on two grounds. First, he argues that the ALJ improperly evaluated—and discounted—the medical opinion of psychological consultant Dr. Belyea. (Pl.'s Br. Supp. Soc. Sec. App. ("Pl.'s Br.") at 1 [ECF No. 13].) Second, he argues that the ALJ's RFC determination fails to fully account for his full range of mental impairments. *Id.* The Commissioner, without directly addressing Joshua's arguments, maintains that the ALJ adequately accounted for Joshua's mental functioning limitations in her RFC determination. (*See* Comm'r's Opp. at 9.) Because the court agrees that remand is necessary as to Joshua's second argument, it will not reach the first.

When assessing an RFC, an ALJ must consider the limiting impacts of a claimant's physical and mental impairments. 20 C.F.R. §§ 404.1545(a)(1)–(3). In evaluating a claimant's mental impairments at steps two and three, the regulations require ALJs to use a "special technique." *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520a). The ALJ must make "a specific finding as to the degree of limitation" in each of the four areas of functional limitation listed in 20 C.F.R. § 404.1520a(c)(3): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* (quoting 20 C.F.R. § 404.1520(e)(4)). The ALJ, in sum, must determine the extent to which the mental impairment interferes with a claimant's ability to function. "A rating of 'none' or 'mild' generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do

basic work activities." *Kimberly J. v. O'Malley*, No. 7:22-cv-704, 2024 WL 1885571, at *8 (W.D. Va. Mar. 8, 2024). While an ALJ may determine that a claimant's mental impairment is non-severe, she must still consider whether that impairment causes limitations to the claimant's RFC. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("To make [an RFC] assessment, the ALJ must consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including those not labeled severe at step two." (cleaned up) (second and third alterations in original)); *Richardson v. Saul*, No. 4:19-CV-00128-FL, 2020 WL 3816317, at *4 (E.D.N.C. June 9, 2020) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). Under Social Security Ruling 96-8p, "[t]he mental RFC assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment" than the analysis under steps two and three by "itemizing various functions . . . of the adult mental disorders listings." 1996 WL 374184, at *4 (July 2, 1996).

In her opinion, ALJ Munday determined that Joshua had a mild limitation in understanding, remembering, or applying information, and moderate limitations in the other three categories. (R. 36–37.) ALJ Munday then concluded that Joshua was capable of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), though he should be limited to "simple, routine tasks; occasional interaction with the public and coworkers; and occasional workplace changes." (R. 37.) Joshua challenges this conclusion, arguing ALJ Munday failed to adequately consider or include appropriate mental restrictions—even if he displayed non-severe mental impairments—in the RFC assessment. (Pl.'s Br. at 15–18.) Specifically, he argues that the ALJ's error is especially harmful because the RFC does not account for his moderate limitations in concentrating, persisting, and maintaining pace ("CPP limitations"). (*See* Pl.'s Br.

at 17 ("This RFC makes no account for Plaintiff's inability to concentrate for extended periods of time[,] nor does it include 10 [percent] time off task.").[5]  The court agrees.

"An ALJ who identifies a moderate limitation in CPP at step three must either account for that limitation in the claimant's RFC or explain why doing so is unnecessary." *Robert S. v. Saul*, No. 5:19-cv-00055, 2021 WL 276170, at *5 (W.D. Va. Jan. 27, 2021). Limiting a claimant to simple, routine tasks—without proper explanation—is insufficient to address their CPP limitations, because "the ability to perform simple tasks differs from the ability to stay on task." *Mascio*, 780 F.3d at 628; *see Richardson*, 2020 WL 3816317, at *5 (listing cases where courts remanded because the ALJ did not address moderate CPP limitations in the RFC); *Phillips v. Berryhill*, No. 9:17-cv-01945-DCN, 2018 WL 6604228, at *4 (D.S.C. Dec. 17, 2018); *Carter v. Berryhill*, No. 8:17-cv-01277-PMD-JDA, 2018 WL 3353069, at *9 (D.S.C. June 18, 2018), *R.&R. adopted by*, No. 8:17-1277-PMD, 2018 WL 3344649 (D.S.C. July 9, 2018); *cf. Shinaberry*, 952 F.3d at 121–22 (affirming ALJ's determination that claimant could perform light work restricted to simple, repetitive tasks despite her moderate CPP limitations because ALJ made specific references to claimant's previous performance on memory tests, considerable work history, school performance, and testimony). If an ALJ places additional restrictions on the claimant's simple, repetitive work to accommodate CPP limitations, she must adequately explain how those restrictions account for those limitations. *See Thomas v. Colvin*, No. 7:15-cv-101-KS, 2016 WL 5408114, at *3 (E.D.N.C Sep. 28, 2016). For example, one district court

---

[5] To support his argument, Joshua highlights that ALJ Munday did not include restrictions related to the SAPCs' ten percent estimate of time off task. (Pl.'s Br. at 16–17.) Insofar as Joshua asks the court to remand based on the ALJ's failure to specifically quantify a "time off-task" percentage or failure to posit this exact hypothetical to the VE, the court declines to do so. *See Berry v. Comm'r Soc. Sec.*, No. 3:21-cv-00240-RJC, 2022 WL 3354778, at *2–3 (W.D.N.C. Aug. 12, 2022) (explaining that ALJs need not quantify an exact time-off percentage, but if they do, they must explain how they arrived at the specific number).

determined that, even though an ALJ restricted a claimant to occasional interaction with others and infrequent changes in the work environment, the restrictions solely

> reflect[ed] limitations in Plaintiff's ability to respond appropriately to changes in the work setting and her social functioning . . . . These restrictions d[id] not appear to relate to Plaintiff's ability to maintain attention and concentration for extended periods of time or to sustain an ordinary routine without special supervision, areas in which Plaintiff was noted to have marked limitations . . . . Nor d[id] these limitations appear to address Plaintiff's ability to work in coordination with or proximity to others without being distracted by them.

*Id.* Because neither the RFC's restrictions of simple, repetitive work nor the additional social and workplace-change restrictions addressed the claimant's moderate CPP limitations, the court found remand necessary. *Id.*; *see also Shannon R. v. Kijakazi*, No. 5:20-cv-00084, 2022 WL 636638, at *9–10 (W.D. Va. Mar. 4, 2022); *Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) (holding that ALJ accommodated the claimant's moderate CPP limitations where he found that he should work in "low-stress non-production jobs with no public contact.").

ALJ Munday's RFC assessment suffers the same shortcomings. By limiting Joshua to simple, repetitive work with "occasional interaction with the public and coworkers" and "occasional workplace changes,"[6] she failed to connect these restrictions to his CPP

---

[6] The court's review is frustrated by a further, unresolved discrepancy in the RFC assessment. Upon initial review and reconsideration of Joshua's DIB application, the SAPCs opined that Joshua could perform simple, repetitive tasks with occasional social interaction. (R. 90–92, 99–105.) ALJ Munday found both SAPC opinions "partially persuasive," though she acknowledged that "additional evidence is consistent with additional work change restrictions." (R. 44 (listing Joshua's "lack of motivation, worrying, decreased concentration, irritability, and difficulty with flashbacks"); *see also* R. 49 (opining that Joshua's ability to perform the full range of light work "has been impeded by additional limitations").) Ultimately, however, ALJ Munday restricted Joshua to the same "occasional interaction with the public and coworkers" as the SAPCs, then added that he could manage "occasional workplace changes." (R. 37.) If the ALJ intended "occasional workplace changes" to address Joshua's limitations, the term is too vague to enable meaningful review, leaving the court to hypothesize whether her RFC adequately incorporated the "additional workplace restrictions" that she initially deemed necessary. *See Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015); *see also Mark T. v. Berryhill*, No. CBD-18-0513, 2019 WL 2250575, at *4 (D. Md. May 23, 2019) ("[W]hen an ALJ includes specific terminology in the limitations

limitations. (R. 37.) To be sure, the ALJ observed that Joshua showed "mixed signs" in cognitive exams—mainly to discount Dr. Belyea's opinion, rather than to support her RFC assessment—and that he could do household chores. (R. 43.) But "the ability to perform simple tasks differs from the ability to stay on task." *Mascio*, 780 F.3d at 638. Standing alone, the ALJ's conclusion that Joshua could concentrate—even on simple tasks—merely because he can cursorily engage in daily household activities is not supported by substantial evidence. *Id.* Further, the ALJ did not explain how the restrictions relate to Joshua's CPP limitations, rather than his limitations in the other functional areas. *Phillips*, 2018 WL 6604228, at *4 (agreeing that restricting a claimant to "'occasional interaction with co-workers and members of the general public along with few workplace changes' deals with workplace adaptation, not CPP limitations"). Without a more thorough analysis of this issue, the court cannot accurately determine whether the ALJ's denial was consistent with the law and applicable regulations. *Cf. Richardson*, 2020 WL 3816317, at *5 ("Although an ALJ's findings at step three may not require any additional limitations for concentration, persistence, or pace in the RFC, the ALJ must at least provide a sufficient explanation in the decision to allow the court to conduct meaningful review of the RFC determination."). Remand is thus required.

## IV. CONCLUSION

For the foregoing reasons, the court will remand this matter to the Commissioner for further proceedings consistent with this Opinion.

---

included in an RFC assessment, she must provide sufficient information so that the courts can understand what is meant by the term.").

- 18 -

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 17th day of February, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE